**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JAMIE LYNN WEIRAUCH

      *Plaintiff,*

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

      *Defendant.*

_____/

CASE NO. 20-11511

HON. DENISE PAGE HOOD
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 21–23.)

## I.    RECOMMENDATION

Plaintiff Jamie Weirauch challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income benefits ("SSI"). The matter was referred to me for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF Nos. 21, 22)[1], **GRANTING** the Commissioner's motion, (ECF No. 23), and **AFFIRMING** the Commissioner's final decision.

---

[1] For reference, ECF No. 21 is only Plaintiff's motion document, and ECF No. 22 is Plaintiff's motion and brief in support of the motion.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff's applications[2] for DIB and SSI were filed on March 13, 2018 and March 20, 2018, respectively. (ECF No. 19-15, PageID.314, 316.) For the purposes of DIB and SSI, Plaintiff alleged she became disabled on June 8, 2017. (*Id.*) The Commissioner denied the claims. (ECF No. 19-4, PageID.209, 226.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on May 2, 2019. (ECF No. 19-2, PageID.93–142.) The ALJ issued a decision on July 25, 2019, finding that Plaintiff was not disabled. (*Id.* at PageID.74–92.) The Appeals Council denied review on April 6, 2020. (*Id.* at PageID.59.) Plaintiff sought judicial review on June 10, 2020. (ECF No. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 22, 23, 25.)

### B.    Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a

---

[2] Plaintiff has previous applications for DIB and SSI, and the applications do not appear to be part of this record. Nevertheless, the June 2017 ALJ hearing decision references applications for DIB and SSI made in May 2015. (ECF No. 19-3, PageID.147.) This decision was unfavorable to Plaintiff. (*Id.* at PageID.144.) The Appeals Council denied review. (*Id.* at PageID.162.) There does not appear to be litigation subsequent to that Appeals Council decision.

preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform

given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 19-2, PageID.88.) At step one, the ALJ found Plaintiff met the insured status requirements through September 30, 2017. (*Id.* at PageID.77.) Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (*Id.*) At step two, the ALJ concluded that Plaintiff's severe impairments were right shoulder bursitis, rotator cuff tendinitis, and osteoarthritis; degenerative disc disease of the cervical spine with radiculopathy and with nerve root contact; status post cervical discectomy and interior cervical decompression fusion; sciatica; migraines; history of seizure disorder; demyelinating disease; asthma; and depression. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.78.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she requires a sit stand option at will, but will not be off task for more than 10% of the workday. She can occasionally perform rotation, flexion and hyperextension of the neck. The claimant can occasionally overhead reach, balance and crouch. She is unable to climb ladders ropes or scaffolds or perform work around moving machinery or unprotected heights. The claimant must avoid concentrated exposure to environmental irritants, such as fumes, odors, dust, gasses; poorly ventilated areas; extreme cold and heat; and humidity. She is limited to no foot controls. She is to have two extra bathroom breaks during the workday of no more than five minutes each while remaining on task 90% of the workday. She is limited to frequent handling and fingering, pushing and pulling with the right dominant upper extremity. She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work. She is limited to making simple work-related decisions. She is limited to tolerating few

5

changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained.

(*Id.* at PageID.80–81.) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.86.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.* at PageID.87.) This included office helper, merchandise marker, and sorter. (*Id.*) Accordingly, Plaintiff was found to be not disabled. (*Id.* at PageID.88.)

### E.   Administrative Record

#### 1.   Overview of Medical Evidence

##### a.   Treatment Notes

In November 2014, Plaintiff presented to Dr. Randall Haugen, of Battle Creek Counseling, for a matter with Calhoun County Department of Human Services regarding Plaintiff's ability to provide a stable environment for children. (ECF No. 19-7, PageID.386–90.) Plaintiff was described as alert and oriented. (*Id.* at PageID.389.) Her affect was appropriate, and her memory functions were grossly intact. (*Id.*) After further analysis, there were recommendations for education and training related to the family-related matter. (*Id.* at PageID.390.)

In September 2015, Plaintiff had a brain MRI. (ECF No. 19-7, PageID.413.) The impression was multiple nonspecific subcortical and deep white matter and hyper intense lesions within the bilateral cerebral hemispheres. (*Id.*) The differential diagnosis noted demyelinating disease such as MS and the previous migraine headache etiologies. (*Id.*)

In October 2015, Plaintiff returned to Bronson Neuroscience Center for a follow up on her seizures and brain MRI. (*Id.* at PageID.419.) Plaintiff was seizure-free since April 2015. (*Id.*) She was taking Trileptal medication[3]. (*Id.*) It was noted that Plaintiff's MRIs had no significant changes over the last five months, but there was progression noted for white matter lesions since 2008. (*Id.* at PageID.420.) Plaintiff's health history, here, noted Plaintiff had a history of migraines and depression which were well controlled. (*Id.*) Also, Plaintiff had a history of seizures noted in 1996, 2004, and 2008. (*Id.*) A review of systems and physical exam showed generally normal systems, including being alert/oriented, 5/5 motor strength in all extremities, 2/4 deep tendon reflexes, and intact sensation. (*Id.* at PageID.421.) Plaintiff had a narrow gait. (*Id.*)

An x-ray of the cervical spine showed some fragmentation of the bone graft at the C6-C7 intervertebral disc space. (*Id.* at PageID.426.) The record noted Plaintiff's history of an earlier discectomy and fusion at C5 to C7. (*Id.*) Further, a November 2015 follow-up to her cervical spinal surgery noted resolution of her preoperative left arm pain and neck pain, and she was doing well. (*Id.* at PageID.429, 430.)

In June 2016, an MRI of Plaintiff's spine showed no suspicious areas of cord signal hyperintensity and mild degenerative changes at C3-C4 and C4-C5 without significant canal stenosis or nerve root impingement. (*Id.* at PageID.438.)

Plaintiff returned to Bronson Neuroscience for a follow up appointment in August 2016. (*Id.* at PageID.455–58.) Her systems and examination remained largely similar to

---

[3] Dr. Phillips' assessment noted that Plaintiff's epilepsy was well controlled with Trileptal, and the medication was tolerated without side effect. (ECF No. 19-7, PageID.421.)

her October 2015 appointment. (*Id.* at PageID.457. *See also id.* at PageID.420–21.) No changes were made to her Trileptal medication, and her examinations were stable without neurologic deficits. (*Id.* at PageID.458.)

Plaintiff reported to the emergency room of Bronson Battle Creek Hospital in September 2016. (ECF No. 19-8, PageID.529.) Plaintiff complained of low back pain that began four days earlier and was significantly worse as of that day. (*Id.*) Pain radiated down her left leg, but she denied numbness or weakness. (*Id.*) On examination, her back had reproducible tenderness in the lower lumbar musculature, very mild midline tenderness over the lumbar area, and no swelling, edema, or erythema. (*Id.* at PageID.530.) Plaintiff was discharged with a prescription for Norco and Motrin. (*Id.* at PageID.531.)

Plaintiff had emergency room treatment for hand pain and for a rib injury. (*Id.* at PageID.523, 526.) In January 2017, Plaintiff received steroid injections following a complaint of right shoulder pain[4]. (*Id.* at PageID.519–22.) Plaintiff was directed to proceed with a home exercise plan and NSAIDS. (*Id.* at PageID.522.) Plaintiff had bronchitis which resulted in an emergency room contact. (*Id.* at PageID.515–18.) Plaintiff had generalized abdominal pain which also resulted in an emergency room contact. (*Id.* at PageID.509–12.) Diagnostic imagery showed evidence of small non-obstructing stone in right kidney, trace bilateral pleural effusions, and cystic lesions on her right ovary. (*Id.* at PageID.511.) Plaintiff received prescriptions for Norco and Bentyl. (*Id.*)

---

[4] The impression here noted osteoarthritis, rotator cuff tendinitis, shoulder impingement syndrome, and subacromial bursitis. (ECF No. 19-8, PageID.522.)

Plaintiff returned to Bronson Neuroscience in February 2017 for a follow-up appointment, where she was last seen in August 2016. (*Id.* at PageID.506.) Plaintiff was alert, had an appropriate mood and affect, had normal muscle tone and 5/5 strength in all four extremities, and intact sensation and reflexes. (*Id.* at PageID.507.) She had a narrow gait. (*Id.*) Plaintiff continued on Trileptal without seizures. (*Id.* at PageID.508.) Her sodium level was low, and other medication such as Keppra was considered because of Trileptal's effect on sodium levels. (*Id.*) Plaintiff's exams continued to be stable. (*Id.*)

Plaintiff returned to the emergency room in March 2017 for back pain and leg pain. (*Id.* at PageID.503–06.) Plaintiff had tenderness in her musculoskeletal exam. (*Id.* at PageID.505.) Plaintiff was given prescriptions for Norco, Valium, and ibuprofen for pain management. (*Id.*) Plaintiff had another emergency room contact that month for cough, chest pain, and a sore throat. (*Id.* at PageID.500.) Plaintiff had stable vital signs, and a negative chest x-ray for any acute findings. (*Id.* at PageID.502.) Plaintiff was given cough medication. (*Id.*) Plaintiff reported conditions of generalized abdominal pain, with tenderness in the right upper quadrant. (*Id.* at PageID.496, 499.) Plaintiff was discharged with Zofran and Norco prescriptions. (*Id.* at PageID.499.)

Plaintiff had a follow-up with Bronson Neuroscience in May 2017. (*Id.* at PageID.493.) Plaintiff's Keppra medication was not tolerated well, so Plaintiff returned to Trileptal. (*Id.* at PageID.495.) Her examination remained stable without neurological defect. (*Id.*) Plaintiff inquired of driving, in light of being seizure-free since 2014. (*Id.*) An addendum to this record noted an episode of vaso-vagal syncope in July 2017. (*Id.*)

Plaintiff returned to the emergency room in June 2017. (*Id.* at PageID.490.) She complained of low back pain that radiated down her left leg. (*Id.*) There were no known injuries that could cause the pain, and Plaintiff denied numbness, tingling, or weakness. (*Id.*) On examination, Plaintiff had midline L3-L5 tenderness. (*Id.* at PageID.492.) Plaintiff was prescribed Motrin and Lidoderm patches, and was advised to refer to a spine clinic for pain and for primary care provider for a physical therapy referral. (*Id.*) In September 2017, Plaintiff complained of right flank pain. (*Id.* at PageID.486.) Plaintiff had mild tenderness in the right upper quadrant. (*Id.* at PageID.489.) Plaintiff had unremarkable lab results, and her gallbladder ultrasound did not show gallstones or cholecystitis. (*Id.*) Plaintiff was discharged home and instructed to follow-up with family physician. (*Id.*) In November 2017, Plaintiff complained of asthma. (*Id.* at PageID.483.) Plaintiff was given breathing treatment using Duo-Neb and Prednisone, and she stated she felt better on reexamination. (*Id.* at PageID.485.) Plaintiff was given a prescription for Deltasone. (*Id.*) In December 2017, Plaintiff reported neck pain and headache. (*Id.* at PageID.480.) Plaintiff denied numbness, tingling, or weakness. (*Id.*) The record noted an x-ray with a result of minimal degenerative changes at the C4-C5 level, and otherwise unremarkable cervical spine. (*Id.* at PageID.482.) Plaintiff had normal range of motion in her neck, and upper cervical paraspinal tenderness. (*Id.*) Plaintiff was given a prescription for Norco and instructed to follow-up with her primary care provider. (*Id.*)

Plaintiff had contact with Grace Health. (ECF No. 19-9, PageID.710–48.) Plaintiff complained of earache and right shoulder pain (*id.* at PageID.744), headache (*id.* at PageID.738), dyspareunia (*id.* at PageID.720.), cough (*id.* at PageID.733), and neck pain

(*id.* at PageID.728). Plaintiff generally had normal physical examinations (*id.* at PageID.718, 724, 731, 736, 741, 746), except for right shoulder tenderness and mild pain with motion (*id.* at PageID.746), bilateral adnexa and tender uterus (*id.* at PageID.724), tender sinuses (*id.* at PageID.736), and pain in her shoulder when testing her range of motion (*id.* at PageID.731). Plaintiff was referred to physical therapy. (*Id.* at PageID.746.) Plaintiff was advised to take metoprolol, lisinopril, and firicet for headaches. (*Id.* at PageID.742.) She was advised to take Symbicort for asthma. (*Id.* at PageID.736.) And she was advised regarding exercises, medication, and intramuscular injection for cervical pain. (*Id.* at PageID.731.)

Plaintiff had a seizure follow-up at Bronson Neuroscience in January 2018. (ECF No. 19-8, PageID.477.) Plaintiff continued on Trileptal and had a stable exam. (*Id.* at PageID.479.) Plaintiff's blood pressure was elevated, and she should discuss this with her primary care provider. (*Id.*) Plaintiff's migraines were controlled, though there were recent increases. (*Id.*)

In May 2018, Plaintiff complained of chest pain at an emergency room contact. (ECF No. 19-9, PageID.761.) Plaintiff had a normal physical examination. (*Id.* at PageID.762.) Plaintiff was admitted for further evaluation through a stress test or echocardiogram. (*Id.* at PageID.764.) Plaintiff stated trouble with intermittent dizziness and confusion with hyponatremia (abnormally low sodium in the blood). (*Id.*) Her serial cardiac enzyme tests and ECGs were unremarkable. (*Id.* at PageID.769.) Her stress test was negative without signs of ischemia or wall motion abnormalities. (*Id.*)

At the end of May, Plaintiff underwent a total laparoscopic hysterectomy and bilateral salpingo oophorectomy. (*Id.* at PageID.752–60.)

Plaintiff had several emergency room contacts with Promedica Herrick Hospital. Plaintiff complained of shortness of breath and cough (ECF No. 19-10, PageID.829), an ankle injury (*id.* at PageID.835), shoulder pain (*id.* at PageID.846), arm pain (*id.* at PageID.852), knee pain (*id.* at PageID.857), and a finger injury (*id.* at PageID.863). Plaintiff had otherwise normal physical evaluations, except the complaints noted tenderness in the respective physical systems. (*Id.* at PageID.830–31, 836–37, 847–48, 854, 858–59, 865.) Plaintiff's left knee had moderate range of motion with pain and with mild swelling. (*Id.* at PageID.859.) Plaintiff was treated for bronchitis. (*Id.* at PageID.831.)

Plaintiff received treatment at Lenawee Adult & Pediatric Medicine. (*Id.* at PageID.869–897.) Plaintiff had normal physical exams. (*Id.* at PageID.870–71, 872–73, 874–75, 876–77, 878–79, 880–81, 883.) Plaintiff received medication prescriptions, testing, or education for bronchitis, hypertension, depression, epilepsy, low back pain, laryngitis, right shoulder pain, hyperglycemia, allergic rhinitis, urinary incontinence, neck pain, right elbow pain, tennis elbow, and fatigue. (*See*, *e.g.*, *id.* at PageID.871, 873, 875, 877, 879, 881, 883).

### b.   Opinion Evidence

Dr. Timothy Strang provided an adult mental status evaluation of Plaintiff in July 2018. (ECF No. 19-9, PageID.822–26.) Dr. Strang's medical source statement said, "Claimant revealed moderate limitations with her ability to follow complex instructions and retain knowledge. There were moderate limitations with concentration and task

12

persistence. Socially, she did not show anything beyond mild limitations." (*Id.* at PageID.825.) Here, Plaintiff listed doing limited activities, such as showering every other day, and watching TV; as she stated, she did "'not really much of anything'". (*Id.* at PageID.823–24.) Dr. Strang noted Plaintiff lacked spontaneity, but that her thoughts were logical, and speech was understandable. (*Id.* at PageID.824.) She had a blunted affect. (*Id.*)

Plaintiff's disability claims were evaluated by state agency doctors Larry Jackson, M.D. and Jung Kim, M.D. (ECF No. 19-3, PageID.168–199.) Plaintiff's medically determinable impairments were degenerative disc disease (severe), asthma (severe), and depression (non-severe). (*Id.* at PageID.175, 191.) Plaintiff's subjective symptom claims were found to be partially consistent; diagnostic imagery and physical examination were normal. (*Id.* at PageID.177, 193.) Plaintiff's residual functional capacity was assessed as follows. Plaintiff can occasionally lift/carry 20 pounds, and frequently lift 10 pounds. (*Id.* at PageID.178, 194.) She can stand/walk for six hours in an eight-hour workday and sit for six hours of the workday. (*Id.*) Plaintiff can frequently crawl and balance; occasionally climb stairs, stoop, kneel and crouch; and never climb ladders. (*Id.* at PageID.179, 195.) Her right overhead reach is limited to occasional. (*Id.*) Plaintiff must avoid concentrated exposure to extreme cold and fumes/odors/dusts and avoid all exposure to hazards. (*Id.* at PageID.180, 196.) Plaintiff is capable of light work. (*Id.* at PageID.182, 198.) She was determined to be not disabled. (*Id.*)

###### 2.    Application Reports and Administrative Hearings

###### a.    Seizure Questionnaire

Plaintiff completed a seizure questionnaire in April 2018. (ECF No. 19-6, PageID.351.) Plaintiff's history of seizures stated her first seizure was in November 1996 and her last seizure was August 2014. (*Id.* at PageID.350.) Plaintiff stated there was no warning before a seizure occurs. (*Id.*) After a seizure, Plaintiff said the following usually occurred: dizziness or weakness, long-lasting headache, long period of sleep, and muscle soreness, but not nausea or vomiting. (*Id.*) Plaintiff took Trileptal two times per day for her seizures. (*Id.* at PageID.351.) Her medication changed because of increased neck pain. (*Id.*) Plaintiff said she had driving or work limitations because of seizures. (*Id.*)

###### b.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she lived at home with her fiancé and daughter. (ECF No. 19-2, PageID.104–05.) She had a tenth-grade education, and she did not have a G.E.D. (*Id.* at PageID.106.) She can read. (*Id.* at PageID.107.) She could not handle a checking account because she never learned to do so. (*Id.*) She did not have a driver's license because of a seizure disorder and blackouts. (*Id.*) She last had a driver's license in 2014. (*Id.* at PageID.108.) She last worked in August 2014. (*Id.*)

Plaintiff had difficulty going up and down the stairs at home; she had difficulty breathing and pain in her legs and back. (*Id.* at PageID.105.)

Plaintiff's husband works. (*Id.*) Her daughter is in the third grade; the daughter gets ready for school and to the bus by herself. (*Id.* at PageID.106.)

Plaintiff said she cannot work because she cannot drive, and she has pain in her neck and shoulders. (*Id.* at PageID.110.) Further, her hands were going bad, and her right arm was numb. (*Id.*) Also, she had seizures and blackouts. (*Id.*) Plaintiff said her pain was constant in her arms and shoulders when laying down and in her back when she walks. (*Id.* at PageID.111.) She said she had depression, and she could not focus. (*Id.* at PageID.112.)

For treatment, Plaintiff saw a neurologist and her family doctor. (*Id.* at PageID.110.) She took medication for her conditions. (*Id.*) She used a nebulizer and inhaler. (*Id.* at PageID.118–19.)

Plaintiff said she could walk for five minutes and sit down for "quite some time." (*Id.* at PageID.112.) She could not lift a gallon of milk with her right hand. (*Id.*) Plaintiff described her daily activities as sitting on the couch and watching TV, sweeping the floor and some cooking. (*Id.* at PageID.112–13.) Plaintiff did not belong to any groups or churches, she did not see family or friends, and she did not have any pets. (*Id.* at PageID.113.) Plaintiff did not have a smartphone or a computer. (*Id.*)

After the ALJ inquiry about Plaintiff's ability to sort nuts and bolts, Plaintiff said she could not do that work because of her shoulders and hands would hurt, as well as sitting too long would hurt. (*Id.* at PageID.114.) Plaintiff could sit for 15 to 20 minutes. (*Id.* at PageID.119.)

Plaintiff stated that cooking and writing caused her hand pain to increase. (*Id.* at PageID.115.) She said the hand issue existed for the last two years. (*Id.* at PageID.116.) Further, washing her hair caused some hand and wrist pain. (*Id.*) Plaintiff was asked about times when her shoulder pain increased, and she could not respond because she has a bad

memory. (*Id.* at PageID.118.) Plaintiff used the bathroom twice an hour. (*Id.* at PageID.121.) She napped for three to four hours of the day, whenever she was tired. (*Id.* at PageID.121–22.) Plaintiff had a good night's sleep about two times per week. (*Id.* at PageID.122.)

Plaintiff had not spoken to her doctors about back surgery. (*Id.* at PageID.123.)

Plaintiff's last seizure was in September 2018 and, before then, in 2014. (*Id.*)

### c.   The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ identified Plaintiff's past relevant work as home attendant, vehicle assembler, and salvage laborer. (*Id.* at PageID.126.) The ALJ inquired of the VE with the following hypothetical:

> She's able to do light work, except she requires a sit/stand option at will but will not be off task more than 10% of the workday. She can occasionally perform rotation, flexion and hyper-extension of the neck. The claimant can occasionally reach, overhead reach, balance, and crouch. She is unable to climb ladders, ropes or scaffolds or perform work around moving machinery or unprotected heights. The claimant must avoid concentrated exposure to environmental irritants, such as fumes, odors, dust, gases, poorly ventilated areas, extreme cold and heat and humidity.

(*Id.* at PageID.126–27.) The VE identified that the hypothetical person could not perform Plaintiff's past relevant work. (*Id.* at PageID.127.) The VE identified jobs that could be performed with the limits of the hypothetical: office helper (70,000 jobs); merchandise marker (90,000 jobs); and sorter (70,000 jobs). (*Id.* at PageID.127–28.)

For the second hypothetical, the ALJ added to the limits and terms of the first hypothetical. (*Id.* at PageID.128.) The ALJ inquired:

She is limited to no foot controls. She is to have two extra bathroom breaks during the workday or no more than five minutes each while remaining on task 90% of the workday. She is limited to frequent handling and fingering, pushing and pulling with the right upper extremity. She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace. For example, no assembly line work. She is limited to making simple work-related decisions. She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable predictable work setting, any necessary changes need to occur infrequently and be adequately and easily explained. . . . So I'm going to make that right upper extremity limitation, the right dominant upper extremity [for handling, fingering and hand controls.]

(*Id.* at PageID.128–29.) The VE stated the same jobs, previously identified, would apply with these additional limitations, without reducing the number of jobs. (*Id.* at PageID.129.)

For the third hypothetical, the ALJ inquired as to the same limits as the second hypothetical, except that the limitations were for sedentary work. (*Id.*) The VE identified these jobs within these limitations: information clerk (100,000 jobs); document preparer (100,000 jobs); and address clerk (60,000 jobs). (*Id.*)

Finally, ALJ inquired about 1) being off-task for 25% of the workday, 2) lying down during the workday outside of normal breaks, and 3) missing two or more days a month as unplanned absences. (*Id.* at PageID.130–31.) Each of these were work preclusive. (*Id.*)

The VE identified certain limitations were not based on the *Dictionary of Occupational Titles*, and they were based on the VE's professional experience and education; this included the limitations of the sit/stand option, on-task time, overhead reaching, production pace, extra bathroom breaks. (*Id.* at PageID.127, 130.)

Counsel for Plaintiff inquired of the VE. Counsel asked of five extra five-minute bathroom breaks, and the VE indicated that would not be work preclusive. (*Id.* at

17

PageID.132–33.) Next, if there was a limit for two bathroom breaks per hour, unpredictably spaced, then that is closer to being off-task enough to be reprimanded, according to the VE. (*Id.* at PageID.133.) Counsel also inquired about the process of ascertaining the number of jobs in the national economy, given the information in the *DOT*. (*Id.* at PageID.135–40.)

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)    Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-

language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings,

including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

> (i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);
>
> (ii)  Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the

factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)     Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

    (iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

    (iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

    (v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

    (vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable

clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and

persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

27

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G.     Arguments and Analysis

#### 1.     Plaintiff's Mental Limitations in her RFC.

Plaintiff argues for remand based on alleged flaws in the ALJ's findings about her RFC and the hypothetical questions to the VE, both related to her mental limitations. Specifically, Plaintiff alleges error in that the RFC and VE questions do not account for Plaintiff's moderate limitations in concentration and task persistence. Plaintiff is incorrect.

The consulting examiner, Dr. Strang found, in relevant part, "There were moderate limitations with [Plaintiff's] concentration and task persistence. (ECF No. 19-9, PageID.825.) The ALJ found this opinion to be generally persuasive as it was consistent with Plaintiff's conservative treatment and her testimony. (ECF No. 19-2, PageID.85.) Next, the ALJ added to the above mental limitations by considering "the entire record, including the mental health diagnosis, the examining opinion, the State agency findings and opinion, and the claimant's testimony . . . ." (*Id.*) Plaintiff's mental limitations in the RFC were:

> She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work. She is limited to making simple work-related decisions. She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained.

(ECF No. 19-2, PageID.80–81.) These limits reflect the limits asked of the VE. (ECF No. 19-2, PageID.128.)

Plaintiff asserts that the ALJ did not specifically address Plaintiff's limitations related to concentration and task persistence (also stated herein as concentration, persistence, and pace or CPP), and that an RFC limitation of simple, routine, repetitive tasks does not address concentration and task persistence. Plaintiff cites *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516–17 (6th Cir. 2010) in support of that claim. The instant case is distinguishable from *Ealy* because the ALJ there relied on a non-examining source's opinion, but the ALJ did not inquire in the hypothetical about the source's opinion of clear time and speed restrictions[5]. *Ealy*, 594 F.3d at 517. In contrast to the instant case, Dr. Strang did not limit Plaintiff to any time and speed restrictions, only noting, in relevant part, a moderate limitation in concentration and task persistence. This distinction is recognized in *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) ("In other words, the limitation to simple tasks portrays the tasks that she can perform without being affected by her moderate limitations . . . and [the ALJ] further reduced the required attention and concentration by restricting her to routine and repetitive tasks.")

---

[5] In *Ealy*, the non-examining source opined that that claimant's "ability to maintain attention and concentration for extended periods" was moderately limited. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 515 (6th Cir. 2010). Further, the source limited claimant's "ability to sustain attention to complete simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.'" *Id.* at 516.

"Additionally, the consistent trend in this District is to not remand a case on the premise that a claimant with a 'moderate' [CPP] rating cannot perform simple, unskilled, and routine jobs." *Brewer v. Comm'r of Soc. Sec.*, 2011 WL 7546792, at *11 (E.D. Mich. 2011) (collecting cases), *rep. and rec. adopted*, 2012 WL 899341 (E.D. Mich. 2012). Further, cases in this District recognize that *Ealy*—and its *Edwards v. Barnhart*[6] corresponding case—does not address functional CPP limits that are comparably low to the limits in the instant case. *See Bondarenok v. Comm'r of Soc. Sec.*, 2020 WL 5415231, at *6 (E.D. Mich. 2020) (no fast-paced production work is a greater limit than *Edwards*), *rep. and rec. adopted*, 2020 WL 5370198 (E.D. Mich. 2020); *Dunn v. Saul*, 2020 WL 7700614, at *9 (E.D. Mich. 2020) (precluding production-rate pace assembly line work and a limit simple instructions were greater limits than *Edwards*), *rep. and rec. adopted*, 2020 WL 7695900 (E.D. Mich. 2020). *See also Dunbar v. Comm'r of Soc. Sec.*, 2019 WL 7631700, at *6 n 5 (E.D. Mich. 2019) ("The position that 'simple and repetitive' or in this case, 'unskilled work, simple instructions, routine changes, simple decision-making' are intrinsically insufficient to convey moderate concentrational deficiencies reflects an erroneous reading of *Ealy*."), *rep. and rec. adopted*, 2020 WL 365076 (E.D. Mich. 2020).

Plaintiff cites to no relevant medical evidence or opinion evidence that supports greater limitations. Regardless, the ALJ found the need for limits of simple tasks, no production-rate pace, simple decisions, and routine job duties. These limits are clearly within the realm of moderate CPP limits as discussed in the cases above.

---

[6] *Edwards v. Barnhart*, 383 F. Supp.2d 920 (E.D. Mich. 2005).

Next, Plaintiff argues the RFC limitation of "not at a production rate pace, for example, no assembly line work" should be rejected because there is no definition of "fast-paced". Plaintiff's argument is curious because the ALJ clearly did not use the term "fast-paced" in the RFC or inquiry to the VE. Plaintiff further cites several out-of-circuit[7] or out-of-district[8] cases for the general proposition that either, first, limits on fast-paced production or quotas do not directly account for moderate limits in CPP or, second, the terms were improperly defined for accurate VE assessment. Here, Plaintiff's argument is erroneous for different reasons. First, Plaintiff was represented by counsel at the hearing before the ALJ, and counsel did not inquire about this issue to seek to clarify the VE's assessment under the given limits. I suggest this argument is waived. See *Wein v. Comm'r of Soc. Sec.*, 2017 WL 4211048, at *11 (E.D. Mich. 2017) (finding waiver where a purported confusing or vague limitation was not objected to or clarified by counsel at the hearing level), *rep. and rec. adopted*, 2017 WL 4176740 (E.D. Mich. 2017).

Second, Plaintiff's cited cases do not support her claims. The 7th Circuit considered a case whether a "routine tasks and limited interactions with others" limit adequately accounts for that plaintiff's moderate limitation in CPP—a case with fewer limits presented in the instant case—and upheld that limit in the RFC when it adequately accounted for Plaintiff's psychological symptoms. *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (distinguishing *Varga*). *O'Connor-Spinner* is inapt to the instant case, as that ALJ

---

[7] *Varga*, 794 F.3d at 814; *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016).
[8] *Braden v. Berryhill*, 2017 WL 891782 (N.D. Ohio 2017); *Deaton v. Comm'r of Soc. Sec.*, 2013 WL 2897888 (S.D. Ohio 2013).

explicitly eliminated depression and its limiting effects from that plaintiff's severe conditions and RFC; that Court's view—that there was no authority for quota or pace limits for serving as a proxy for moderate CPP—was not essential to the holding in the case, in light of the numerous errors committed there below. Plaintiff, in the instant case, fails to show comparable ALJ error by alleging a failing to consider medical evidence, properly weigh opinion evidence, or consider Plaintiff's testimony—all together with the limitations that are medically associated with Plaintiff's severe impairments. Next, *Braden* and *Deaton* are fact-specific in that they resolve arguments that Plaintiff is not making; *Braden* recognized that pace or quota limits did not address that plaintiff's concentration deficits, and *Deaton*'s limit on strict production requirements was in the context of limiting high stress jobs. These cases do not stand for the proposition that *generally* there is no clear relationship between moderate CPP and fast-pace-, assembly-, or quota-limited work. The errors in these cases involve the fact-specific issues of a claimant, his/her medical evidence, and the appropriate limitations to be analyzed and determined from them. Plaintiff does not raise a corresponding error; she does not suggest that the most she could do is less than the RFC based on the medical evidence. Her cited cases are distinct from her case.

In addition, Plaintiff's cited cases from other district or Circuits are not binding on this Court. *See, e.g.*, *Livingston v. Comm'r of Soc. Sec.*, 2018 WL 4475479, at *5 (W.D. Mich. 2018) ("*Varga* is not binding on this Court.). Finally, "a limitation of non-production-rate work is a common and adequate limitation for those persons who suffer from moderate difficulties in concentration, persistence, or pace." *Pruitt v. Comm'r of Soc. Sec.*, 2015 WL 5730023, at *7 (E.D. Mich. 2015). *See also Lewicki v Comm'r of Soc. Sec.*,

2010 WL 3905375, at *2 (E.D. Mich. 2010) ("Decisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work.").

Plaintiff's assertion that the "not at a production rate of pace" limit is unclear because it does not explicitly include or exclude a fast or variable rate is unavailing. The VE and ALJ, through the evaluation process, determined that Plaintiff could do the Office Helper, Merchandise Marker, and Sorter jobs. Plaintiff does not advance an argument that any of these jobs include fast or variable production rates, nor does she advance an argument that the she cannot do these jobs because of *any* issue she would have with any production rate relative to her severe impairments and the supportive medical evidence. Plaintiff's speculation that a fast-food worker job could or could not be within this RFC is irrelevant to the evaluation process because, by step five, there were jobs identified in substantial number in the national economy that Plaintiff could perform. None of the identified jobs were fast-food worker. Assuming this is a step-five argument, Plaintiff fails to show that the Commissioner did not meet his burden at step five.

Plaintiff returns to an issue about step three in the evaluation process. Plaintiff asserts that "The limitations at step three, therefore, are made part of the RFC so that a determination may be made as to available past work . . . [and] other work in the national economy." (Pl. Br., ECF No. 22-1, PageID.917.) It appears that Plaintiff is not arguing that Plaintiff's severe impairments meet or medically equal listing, nor does she identify a

listing that is relevant[9]. The alleged error here is that, after finding a moderate limitation in CPP in step three, there was not an adequate work-related limitation that accounted for the moderate CPP in the RFC. *See, e.g., Geraldine S. v. Comm'r, Soc. Sec. Admin.*, 2019 WL 3935376 (D. Md. 2019). Here, the ALJ clearly analyzed listing 12.04, considered testimony and opinion evidence, and with the other criteria, determined Plaintiff's mental impairments do not meet or medically equal listing 12.04. (ECF No. 19-2, PageID.79–80.) And, as discussed above, Plaintiff's RFC adequately accounts for her moderate CPP limitations. There is no error here.

Finally, Plaintiff claims error in that the RFC's limitations were not provided by the state agency psychiatrist or Dr. Strang. This is incorrect.

> We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *See Shepard v. Comm'r of Soc. Sec.*, 705 F .App'x 435, 442–43 (6th Cir. 2017) (rejecting the argument that 'the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work'); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the same argument because 'the ALJ is charged with the responsibility of determining the [residual functional capacity] based on her evaluation of the medical and non-medical evidence').

*Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401–02 (6th Cir. 2018). Plaintiff's suggestion that the ALJ "played doctor" is unavailing. The RFC is "based on *all* of the relevant evidence in the case record", and not only medical opinion. SSR 96-8p. A feature of the playing-doctor or substitute-judgment jurisprudence is an ALJ's erroneous

---

[9] Plaintiff does identify the catch-all category of Listing 12, which is Mental Disorders. 20 C.F.R. Part 404, Subpart P, Appendix I. There are 11 categories of mental disorders, and Plaintiff does not identify any that are applicable.

*interpretation* of the medical records over that interpretation of a physician who examined the records. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Plaintiff fails to articulate the erroneous interpretation of any record. Next, Plaintiff's argument shifts to asserting that the ALJ did not articulate the evidentiary support for the RFC. This is incorrect. First, the ALJ stated Dr. Strang's opinion was generally persuasive and stated the reasons for so. (ECF No. 19-2, PageID.85.) Next, the ALJ reviewed the state agency doctor's mental limitations and found them somewhat persuasive, and found greater limitations needed because of Dr. Strang's opinion and Plaintiff's limited mental health treatment. (*Id.*) The ALJ summarized Plaintiff's mental health symptoms as follows:

> As discussed in detail above, the claimant's treatment records indicate that she received only outpatient conservative mental health treatment, which consisted of medication monitored by her primary care physician. Nothing reflects further participation in more intensive services, such as inpatient treatment or emergency services. Overall, the record, as discussed above, generally supports her mental impairments were managed successfully with outpatient treatment. Thus, this level of conservative, outpatient treatment is generally not consistent with the severity of symptoms the claimant has alleged for this period.

(*Id.* at PageID.85.) Contrary to Plaintiff's assertions, the ALJ did provide an explanation in support of the conclusion. Plaintiff fails to provide evidence to contradict the evidence relied upon by the ALJ.

For these reasons, I suggest that there is no error in the ALJ's assessment of the relevant evidence or of Plaintiff's moderate CPP limitation and the limitations and I further suggest the ALJ's analysis is supported by substantial evidence..

## 2.      Plaintiff's Handling and Fingering Limitations in her RFC.

Plaintiff argues that the ALJ's findings regarding Plaintiff's handling and fingering limitations were not supported by medical evidence. This argument suffers from similar flaws as the argument above.

There was no inquiry[10] into this subject at the ALJ hearing by Plaintiff's counsel, so this argument is waived. *See*, *e.g.*, *Wein v. Comm'r of Soc. Sec.*, 2017 WL 4211048, at *11 (E.D. Mich. 2017). Alternatively, even if the issue is considered, the result is the same.

The ALJ recognized Plaintiff's testimony that Plaintiff says she cannot work because of an inability to drive and because of pain in the right hand, right arm, shoulders and neck. (ECF No. 19-2, PageID.81.) The ALJ further recognized Plaintiff stated she could not do a job sorting nuts and bolts because of soreness in the shoulders and hands and difficulty sitting. (*Id.* at PageID.82.) The ALJ recognized Plaintiff's neck and shoulder pain and demyelinating condition, the treatment that she received, and the response to the treatment. (*Id.*) The ALJ recognized the state agency opinion with various exertional, postural, manipulative, and environmental limitations. (*Id.* at PageID.83.) This opinion did not limit Plaintiff's handling or fingering. (ECF No. 19-3, PageID.179, 195.) The ALJ explained that the opinion was generally persuasive, but

> based on later submitted evidence (B9F and B10F), including the claimant's testimony, the undersigned finds that greater postural, manipulative, and

---

[10] There was a question about whether the document preparer has to be able to manipulate a computer or copy machine. (ECF No. 19-2, PageID.134–35.) The nature of this question addresses the capabilities needed for the job. This question would be relevant, here, if Plaintiff argued that she could not perform the document preparer job. However, that is not what she is arguing; she is arguing that the handling/fingering limitations in the RFC are not supported by medical evidence.

environmental limitations are necessary to accommodate the claimant's cervical degenerative disc disease and right shoulder impairment.

(ECF No. 19-2, PageID.84.) The ALJ considered Plaintiff's cervical radiculopathy symptoms and limited Plaintiff to frequent handling and fingering.

Again, the ALJ considered the objective and subjective evidence in this case and arrived at the RFC limitations for handling/fingering. The logical bridge is clear. To prescribe anything else, here, would be reweighing evidence that was considered by the ALJ, and the Court will not do so. *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 147066 at *2 (E.D. Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)).

Plaintiff identified the handing/fingering requirements of the jobs identified in step five and suggests that if Plaintiff was limited to occasional handling and fingering, then those jobs would be precluded. Plaintiff asserts that the ALJ did not explain why she did not limit Plaintiff to occasional handling/fingering rather than the frequent handling/fingering limit that was used. Said another way, this assertion assumes the ALJ played doctor. However, as indicated above, to properly claim an ALJ played-doctor or substituted his or her own judgment, a plaintiff must allege that the ALJ erroneously *interpreted* the medical records and ignored the interpretation of a physician who examined the records. Plaintiff does not point to any portions of the record that the ALJ misinterpreted. Plaintiff also does not identify *any* evidence in support of a limit of occasional handling/fingering in the RFC, and that is her burden. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999). It is curious that the one medical opinion

(from the state agency doctor) that spoke to the issue of handling and fingering suggested no limitation. Thus, if anything, the ALJ's opinion was more favorable to the Plaintiff than necessary. Under these circumstances, Plaintiff has no grounds for complaint. See *Mosed v. Comm'r of Soc. Sec.*, 2016 WL 6211288, at *7 (E.D. Mich. 2016) ("Plaintiff's argument that the ALJ erred in assessing a *more restrictive* RFC than that opined by the State agency consultants is curious and unavailing.") (emphasis in original; citation omitted), *rep. and rec. adopted*, 2016 WL 1082679 (E.D. Mich. 2016).

### 3. The ALJ's Compliance with SSR 00-4p Related to Conflict between the *Dictionary of Occupational Titles* and Vocational Testimony.

In the RFC, the ALJ limited Plaintiff to "occasionally performing[ing] rotation, flexion and hyperextension of the neck." With that, and other limitations, the VE identified the jobs that Plaintiff could perform: sorter, merchandise marker, and office helper. Plaintiff now speculates that these jobs are not performed within the occasional limit of those neck movements. Plaintiff says that the occasional limit is "implausible" for the sorter job, that the merchandise marker "would likely require" flexion for "most of the duties", and the mail duties of the office helper are accomplished "seldom . . . at eye level." (Pl. Br., ECF No. 22-1, PageID.924–25.) Plaintiff's alleged error is that the ALJ did not inquire of the VE about the neck limitation's alleged conflict with the *Dictionary of Occupational Titles* despite the ALJ "appearing to have a good grasp of what was and was not in the Dictionary." (*Id.* at PageID.925.) Plaintiff does not provide a basis for imposing this duty.

What Plaintiff is describing is not a conflict within the meaning of SSR 00-4p and case law. The parties do not controvert that the *Dictionary* does not include neck limitations in the descriptions of occupations. Here, the VE's responses supplement the *Dictionary* and do not create a conflict. *See*, *e.g.*, *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364 (6th Cir. 2014) ("But the *DOT* does not discuss whether jobs have a sit/stand option . . . and therefore the vocational expert's testimony supplemented, rather than conflicted with, *DOT* job descriptions."); *Trischler v. Comm'r of Soc. Sec.*, 2015 WL 5016600, at *25 (E.D. Mich. 2015) (citing *Hynes v. Barnhart*, 2005 WL 1458747, at *5 (D. N.H. 2005) ("Here the vocational expert simply applied his expertise and provided the ALJ with information that was not provided in the DOT. Contrary to claimant's assertion, there was no 'conflict' between the vocational expert's testimony and the data provided by the DOT.")). *See also Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) ("Because the *DOT* does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the *DOT*.").

Assuming arguendo that this is a conflict, in any event the ALJ met her duty under SSR 00-04p.[11] The ALJ "has an affirmative responsibility to ask about any possible conflict

---

[11] Technically and initially, the VE did not ask the VE if there was a conflict with the *DOT*, because the VE identified—after the first hypothetical that included the neck limitation and before his number-of-jobs response—"I'd first like to say that the <u>Dictionary of Occupational Titles</u> does not address the ability to alternate between sitting and standing. Therefore, any response that I give based *upon this hypothetical* would be based on my experience." (ECF No. 19-2, PageID.127) (emphasis added). After the third hypothetical, the ALJ asked "As far as testimony consistency with the DOT, the production pace, the on task, the extra bathroom breaks, the overhead reach, and . . . the sit/stand option, those things are not in the DOT, so that part of your testimony, is that based on your knowledge and experience?" (*Id.* at PageID.130.) The VE replied yes. (*Id.*) The verbiage in this colloquy may be slightly out of sequence, in that answers appear to anticipate questions, but I am satisfied that from this interaction that the ALJ satisfied her duty under SSR 00-4p.

between that VE or VS evidence and information provided in the DOT." SSR 00-04p. In the case of *Lindsley v. Comm'r of Soc. Sec.*, the Court recognized that ALJ satisfied his SSR 00-04p duty by asking about "any apparent discrepancies" (rather than conflicts) between the *DOT* and VE testimony, and further stated that Plaintiff had not "identified any authority requiring ALJs to conduct a mechanical recitation of the precise language in S.S.R. 00-4p for the purpose of determining whether there are inconsistencies." *Lindsley*, 560 F.3d 601, 606 (6th Cir. 2009). The ALJ does not have to investigate the accuracy of the VE's testimony beyond the SSR 00-4p inquiry. *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) (citing *Lindsley*, 560 F.3d at 606). "This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT" *Id.* Plaintiff's counsel, at the hearing, did not bring this alleged conflict to the attention of the ALJ.

Plaintiff asserts her interpretation of SSR 00-4p (which was without support under the case law cited above) is supported by the Social Security Administration's Vocational Expert Handbook. However, the handbook is not binding and cannot serve as a basis to undermine the ALJ's decision. *See Edwards v. Comm'r, SSA*, 2019 WL 4564833, at \*2 (E.D. Tex. Sept. 20, 2019) ("The [Vocational Expert H]andbook does not direct the ALJ or the ALJ's determination[.]"); *Black v. Berryhill*, 2018 WL 1472525, at \*24 (D. Utah

---

Plaintiff offers nothing but speculation that the ALJ knew or should have known that neck limitations were not listed in the *DOT*. In any event, Plaintiff's argument does not focus on the duty of the ALJ, which is to inquire about whether the VE testimony conflicts with the *DOT* and to obtain a reasonable explanation for the conflict. Assuming for the moment that the VE testimony was erroneous as to neck use, and assuming the matter of neck use was a conflict with the *DOT*, Plaintiff does not provide any support for the theory that the ALJ had to probe further into the inquiry.

2018) (the handbook merely consists of "orientation materials for new vocational experts"), *rep. and rec. adopted*, 2018 WL 1468573 (D. Utah 2018).

Furthermore, remand would also not be appropriate here as Plaintiff does not present an argument related to the sedentary jobs that the VE identified at the hearing. This is relevant because "If someone can do light work, we determine that he or she can also do sedentary work . . . ." 20 C.F.R. §§ 404.1527; 416.967. At the hearing, the VE identified within a sedentary hypothetical that the jobs that could be performed were information clerk, document preparer, and address clerk. (ECF No. 19-2, PageID.130.) Even if we assume that there is the error that would have warranted remand regarding the ALJ's inquiry of neck limitations, Plaintiff offers no argument that would dispose of the sedentary work. Analysis here is limited to the reasons listed in Plaintiff's brief. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("we limit our consideration to the particular points that [Plaintiff] appears to raise in her brief on appeal."). Since the ALJ's decision at Step Five is supported by sedentary jobs that are unchallenged and exist in adequate numbers in the relevant economy, remand would be futile.

## H.    Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF Nos. 21, 22), **GRANTING** the Commissioner's motion, (ECF No. 23), and **AFFIRMING** the Commissioner's final decision denying benefits.

III.  **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 23, 2021          S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge